Good morning, we will hear argument in case number 22-1726, Hernandez-Martinez v. Atty. Gen. of the United States. Ms. Huffstadter? Good morning, your honors. May it please the court, my name is Rebecca Huffstadter from Legal Services of New Jersey. I represent Petitioner Rolando Hernandez-Martinez. May I reserve three minutes for rebuttal? Granted. Thank you. Gang members in El Salvador murdered Petitioner Rolando Hernandez-Martinez's brother, shot at his family's house, and threatened him at gunpoint. In El Salvador, these gangs, the MS-13 and Barrio 18, are not mere criminal organizations. Instead, they exercise immense power on the national and local level, from negotiating directly with the national government for policy concessions to controlling ordinary people's movement between neighborhoods and bribing police officers to ensure impunity. This court should reverse the decision of the Board of Immigration Appeals denying asylum, withholding, and protection under the Convention Against Torture. The agency's own factual findings and uncontroverted evidence in the record show that Mr. Hernandez-Martinez's persecution was motivated by his relationship to his brother and by his actual and imputed political opinion, and that the Salvadoran government was unwilling and unable to protect him. Yet, the agency's decision suffered from many of the same flaws that this court has corrected in numerous prior cases. It failed to recognize that a persecutor may have multiple motivations. It cherry-picked a few pieces of evidence in the record while ignoring other favorable evidence. And it did not make the factual findings that this court requires in CAT cases. So first, on the issue of nexus... It seemed that the record evidence that the agencies talked about reflected the petitioner's understanding, you know, credible belief that he was targeted for his refusal to participate in gang activity. What evidence did the IJ not consider about why the gang was targeting him as a result of his relationship to his deceased brother? The IJ actually did consider the evidence, but her reasoning was internally inconsistent. So she stated that he was targeted, and this is by Barrio 18, the first gang, based on his presumed resistance to the gang. He never actually spoke to the gang himself. He never actually refused to join the gang. Instead, the gang presumed that he would refuse because his brother had refused to join. So that is based on his relationship to his brother. And it's similar to cases that other circuits have considered, including the Fourth Circuit in Hernandez, Avalos, and Cruz, where the reason that he was... Yes, it related to resistance to recruitment, but the reason that they knew he would resist and the reason that they targeted him and not any other person was because his brother had already resisted. So that is because of the relationship, again, with the brother. What about MS-13? I mean, isn't that even more attenuated, given the distance and time? Yes, Your Honor. We don't argue that MS-13 targeted him because of his relationship to his brother. The IJ found two incidents of persecution, each of which would be sufficient for a finding of past persecution. So the Bardio 18 targeted him because of imputed political opinion and relationship to his brother. MS-13 targeted him because of actual and imputed political opinion. They were the ones to whom he directly expressed his resistance to gangs in a clear way that they imputed to be political. He did appear before an immigration judge and a request for citizenship status was denied very quickly, if I'm not mistaken. And it was denied because of two offenses that he committed while here. One was a disorderly person's offense, but one was a more serious offense where, as I understand it, someone was stabbed. He stabbed another individual. That case, as I understand it, has not been fully decided. But doesn't that affect his request now for citizenship status? Your Honor, he sought both asylum, withholding of removal, and protection under the Convention Against Torture. Only asylum is discretionary, and that's the one that the immigration judge denied in the exercise of discretion as an alternative basis to the ones that we're litigating today. But the BIA exercises de novo review over that decision and didn't reach the discretionary issue on appeal. So if the court reverses the BIA's decision, the BIA would have a chance to review our appeal on that issue of discretion. What was the BIA's ultimate decision? The BIA affirmed based on the finding that the Salvadoran government was willing and able to protect and on the finding that there was no nexus to a protected ground. As it stands, unless we make a different decision, he has to go back. Is that accurate? Yes. He would go back for the BIA to consider this discretionary issue in the first instance. But I'll also note that even if the BIA affirms the IJ on the issue of discretion, he would still be eligible for withholding of removal and protection under the convention. One more question maybe you can answer. Now I understand he had a very serious legal issue, and part of that involved his stabbing somebody while he was here, and that case has not been finished yet or decided yet. What can you say about that? So it's true, the case is still pending, but it has been remanded from the New Jersey Superior Court to Municipal Court. All the indictable offenses have been dismissed, so the only pending charges that remain are disorderly person's offenses. So if he's convicted at all, it will be of a fairly minor disorderly person's offense, and that's not going to prevent him, or it's unlikely to prevent him from being granted withholding of removal and certainly not protection under the convention against torture. Counsel, I understand your position is that in El Salvador, gangs are quasi-political actors. So is it also your position that every Salvadoran who opposes gangs is making a political statement or is acting based on political opinion? No, for three reasons. So first, every case is going to be judged on the record, of course, and the evidence. And in this case, the record evidence established that the gangs operate in a political way. The facts of this particular case also distinguish it from mere refusal to be recruited to the gangs. So Mr. Hernandez-Martinez not only declined to join, he directly told MS-13 members why he was declining to join. He explained his opposition to the gangs to them. Is there something like, I never liked gangs? Yes. What makes that political? It's political in the context of El Salvador because the gangs really are a way to, a way that society is structured. So they operate both at the local level and exercising significant control, including on who can enter and exit communities. But then going back to Judge Freeman's question, then wouldn't anyone who objects to gang recruitment in El Salvador be expressing a political opinion? When would they not be then? It's possible. I think, you know, again, each case would have to be judged on its own facts. And here there is an explicit expression of that opinion, albeit... The opinion is, I don't like gangs, and then I've learned from my family the value of hard work and labor. Right. Okay. Well, if that constitutes a political expression, I'm not sure what wouldn't, right? I mean, that's perhaps the most general expression of disfavor for gang activity that one could hypothesize. Again, just going back to the same question, it sounds like everyone then who objects to gang recruitment in El Salvador would then now be making, as a matter of law, a political expression sufficient for protection under the INA. Is that... I think it's not as a matter of law because it's always going to depend on the specific facts of the case, both the country conditions evidence in the record and the facts of the individual's case. I'll also say that even if it means that there are, you know, that people are expressing political opinion in a larger subset of cases, there are other limitations built into the asylum framework. So, for example, you don't just have to have a political opinion, you have to show that you are actually persecuted on account of that political opinion. So, what is the evidence that either of the gangs understood his statement of declination to be a political expression? So, it's very similar to this court's decision in Espinosa-Cortez. It's what he said to them and the timing of the threats in relation to that. So, he made the statement and the threats followed immediately after, and then it's the fact that he repeatedly refused. So, the gang members came back, they asked him about his prior statement and whether he had changed his mind, and he said, no, I still see it the same way. And then that's when the threats escalated and were made at gunpoint. And that's really very similar to what this court saw as a statement, or at least as evidence of imputed political opinion in Espinosa-Cortez. Would it make a difference that El Salvador has embarked on this tremendous gang crackdown in its own country to the extent that it has made 66,000 arrests in a period of one year? And it's built jails to house many of these gang members that hold over 1,000 prisoners. I mean, doesn't that make a difference in terms of the idea of whether I can go back to El Salvador or not? This is his biggest complaint, isn't it, that he may be affected by gang violence in El Salvador? I might have said Ecuador, El Salvador. Yes. So, turning to the issue of whether he showed that the government of El Salvador was unable or unwilling to protect him, this court has been very clear that effort alone is not enough. For example, in the Garcia case, that even where a government may be trying to control gang violence, that if it's not actually able to protect the individual applicant, that's not sufficient. And both the facts of this case and the country conditions evidence show that, at minimum, the Salvadoran government was unable to protect him. I'm sorry. I was going to say that on that point. That's past tense, though. Excuse me. I know you can't see it from here, but I'm showing you a jail in El Salvador with about 1,000 people in the jail, which was newly constructed to house these types of individuals who are becoming such a burden on the government. So, this is what they're doing. And I'm wondering, well, his claim is that if I go back, the gangs are going to affect me and my family, if he has a family. But that may not be the case. Well, respectfully, Your Honor, with regard to the asylum and withholding of removal claims, the past tense is the relevant question because we're arguing that he suffered past persecution and is entitled to a rebuttable presumption. But he does say, I can't go back there because if I do, I will be mistreated by gangs. Yes, yes, certainly in the context of the cat claim, he argues that. And, you know, respectfully, while there are jails in El Salvador, the country conditions evidence also strongly shows that there's widespread corruption within the police department, both at the local level and at the national level, that the gangs are actually negotiating directly with the president for better conditions in those jails, for special privileges in those jails. And when they don't get what they want, they use violence to force the government's hand. But notwithstanding all the country conditions evidence in the record, there was specific evidence that the police helped your client's father and his family flee the gangs and relocate within the country, and that your client has a younger brother who I am thinking is in his late teens at this point, also potential gang recruitment age, who has lived in country apparently without incident since he was relocated with his father. So doesn't that tend to show that there was no risk to your client if he were to return? No, Your Honor. So first, under Garcia, the fact that the police relocated the family for a second time is legally insufficient. That's really an admission by the police that they're unable to maintain the type of law and order that actually constitutes protection under the act. Instead, all they could do was tell the family, you're going to have to leave the second home that you've built and then been forced out of. And the family ultimately is basically in hiding. That's in the record, page 314 of the administrative record. So that doesn't show that the police is protecting them. That shows that they're hiding. Are they in hiding? I think the father said he goes into town sometimes and goes shopping. He didn't say he was in hiding. I understand that's how you argued it. He said that he rarely goes out of the house. Occasionally he goes into town to do shopping, but that he's basically staying in the home in order to avoid gang members identifying his location. And I'll also note that that second relocation happened after our client already left the country, and there's good reason to believe that he would be differently situated. First, he was the one who was actually directly threatened by MS-13 members, and the evidence in the record shows that those threats are serious, they're credible, and that they do track people down even to alternative locations. Right. Doesn't that somewhat undermine your PSG of family members of the deceased brother, Moises? Because Israel Hernandez Martinez, the younger brother, was not similarly targeted? It doesn't, Your Honor. First, the family was targeted by Barrio 18. The family home was shot at, and the entire family had to leave. So El Planon was the first location where that occurred. The entire family had to leave. Then our client was targeted again in the second location by MS-13, and then the whole family, he fled to the United States and the rest of the family fled to Santa Ana. Also, the Garcia case, remind me, is that the case about the Ghanaian man? No, that's the case where the Guatemalan government had arranged for the individual to go to Mexico. That's correct. That involved relocation outside of the country, correct? It did, but I think the same logic applies. Since we're not talking about reasonable relocation, that might be an issue for remand if we establish past persecution, but we're talking about whether the government was able to protect. And that case said very clearly that by throwing up their hands and saying, you need to move, that's the only way to keep you safe, that was an admission by the law enforcement in that place. I'm recalling now that it was by saying that you need to leave the country, that was an admission that they could not protect them within the country, right? Right, but I think it's equally true that the police in that location were unable to protect them in that location, and they were forced again to give up their home and go live in another place. That's similarly an admission of inability to protect. That was while he was in El Salvador? No, our client had already come to the United States by that point, or was in transit at least. Has he appeared before an immigration judge in the United States? Yes, Your Honor. He's asked for asylum in that process? Yes, that was the proceeding below, yes. And the decision was that he was denied asylum? Correct. Was there a specific reason given why asylum was denied? Yes, Your Honor. So the immigration judge's decision begins on page 58 of the administrative record, but she denied on a few alternative bases, and the ones that the BIA had also reached on appeal that we're appealing here are the nexus to protected grounds, so that's the family-based social group as well as political opinion, and then whether the Salvadoran government was unable or unwilling to protect him. Did that assault that he was involved in play into that also or not? No, it didn't. So that related to another alternative holding, which was the denial of asylum in the exercise of discretion. But again, the board didn't reach that issue, and it wouldn't affect the withholding or CAT claims. Thank you, Your Honor. Thank you, counsel. We are in rebuttal. Mr. Coleman. May it please the Court. My name is Robert Coleman. I represent the Attorney General. A few brief points on the nexus issue. In several places in the record, Hernandez indicated that he was targeted for mistreatment because of his refusal to join the gangs. In his testimony, specifically page 119 and 150 of the record, where he indicated that the gang was going to harm him for not joining, but also, again, in his asylum application in several places, he also did the same. And to distinguish quickly, the Espinoza case cited by opposing counsel regarding the imputation of political opinion. In that case, the petitioner had a long-term association with the Colombian government and military there. So it was easier for the court to say there was an imputation of a political opinion, given those background facts, none of which is here. This individual was on the floor. I think we'd have to agree that there can be no precise standard here from when criminal activity could become revolutionary forces, and oftentimes there is an arc of violence that follows that path. So how do we distinguish when one is being recruited merely for criminal activity or one is being retaliated against based on a political opinion? That's, in essence, why I wanted to point the court to Espinoza, because there was some evidence. So it's important to keep in mind the burden of proof is on Hernandez here. It's Hernandez's burden to show that there is some proof. And at this point, on appeal to this court, the burden is heightened further in that there's a substantial evidence standard of review. So this court needs to find that the record compels the contrary conclusion in order to disturb the decision below. And if petitioner doesn't put forth evidence to make that finding, then that simply will fail. And so other cases, you can just see that there is additional evidence put forward. So, for instance, some type of long-term association with a government force, or sometimes the message communicated to the person who is being persecuted has some kind of political messaging within that, and therefore it can be determined. So there just needs to be evidence that simply is absent in this situation. But the immigration judge in this case didn't discuss hundreds of pages of country conditions evidence that altogether said, really, that the gangs are political actors. And instead she pointed to, like, the abstract of one article, which, frankly, was taken quite out of context. So how can we find that that was a reasonable finding? Well, given the amount of evidence here, the immigration judge did a very thorough job. This is a very long decision by immigration court standards. And here the immigration judge did, for one, at the beginning of her opinion, page 59 of the record, she indicated that she was considering all of the evidence, even if it wasn't specifically cited. But going beyond that, there were at least five, perhaps six references to, or more references than that, but to six specific, five or six specific country conditions exhibits sprinkled throughout the opinion. So they're on pages 70, 72, 74, 77. So to assume that just because in one spot those types of exhibits were not specifically referenced. So I guess if we have a president that says if the immigration judge or the BIA ignore significant evidence that contradicts their findings, then they have to at least, you know, they have to either explain that, or if they ignore it, then we remand. So why wouldn't that be appropriate here, given that she didn't address, you know, she made a finding that was contrary to a large volume of evidence in the record, and didn't explain why, regardless of perhaps citations strewn throughout her opinion. Well, to the extent that you're referring to page 72, note 9, the immigration judge gave an in-depth analysis. Perhaps there wasn't as many citations to the country conditions reports as the court would desire, but there is a significant amount of discussion here. And then there are. Even within the footnote 9? Yes, which is at least 20 pages or 20 lines long, it seems, 15 perhaps. Okay. But the analysis there, if you read it, makes clear that she's considering the relevant factors. And then there are other places within the decision in which the immigration judge, specifically on page 74, the immigration judge specifically acknowledges that there is evidence of organized crime activity in El Salvador, that there is evidence of retribution against people who resist, that there is a high murder rate, for instance. So that evidence was considered, even if it wasn't considered in this specific spot. And, again, this is a thorough decision by immigration court standards. Okay. So you just referred us to page 74, and that's where she's discussing the nexus with regard to the particular social group. That's correct. There's evidence in the record that the only reason why Mr. Hernandez-Martinez was targeted was because he was related to the decedent, Moises Hernandez-Martinez. Or that is perhaps not the only reason, but, like, that is a reason. Would you agree with that? No, we don't agree with that. So this is a classic situation where the relationship to Moises, although present, it's tangential. It's just a means to an end. And this court has case law indicating that such a means to an end is not significant enough to rise to the level of one central reason, specifically the Yallon case as well as the Gonzalez-Posadas case. Doesn't the record say that the gang said, we assume you'll refuse because your brother refused? Correct, but that's the means by which they learned that he would refuse, and it's the refusal that they're punishing. It's the refusal. So we're supposed to overlook the means and find that there could be no nexus. Yes. If the means, just being a means to an end is not enough, according to this court's case law, to constitute one central reason. Tell me again which case you're referring to. Sure. I'm referring to two cases. The Yallon is the first one, T-H-A-Y-A-L-A-N versus Attorney General. That's 997 F3rd 132. That's a Third Circuit opinion from 2021. There's also the Gonzalez-Posadas case v. Attorney General. That's 781 F3rd 677. That's a Third Circuit case from 2015. Hernandez was not, as I understand it, physically attacked in any way while he was in El Salvador by any gang member. That is correct, Your Honor. So he made a decision on his own to leave because he wanted to get away from them? Yes, that's what it appears to be. Could he have relocated somewhere in El Salvador? I understand the gang violence, and I understand that it's very heavy in the populated cities of El Salvador. But his father, I understand, left and got a separate place in El Salvador away from violence. So my question is, could he have done the same thing? Yes, he could have. And this case, at this point, it's important to distinguish this case from Garcia that was referred to during the opening argument, where in Garcia, the government acknowledged that it could not protect the individual and therefore transported the individual elsewhere out of the country. Here, not only was Hernandez's father transported within the same country to Santa Ana, just a different time, but also at Hernandez's father's instigation. Hernandez's father's declaration, within that declaration, he indicates that he sought out the police force and asked them if they would accompany him or maintain his safety as he traveled to Santa Ana. It was not the government saying, we cannot offer you anything else. Was it appropriate for the IJ and the BIA to base their decision about the likelihood of future persecution on people who had remained in country as opposed to a returnee, which is what Hernandez-Martinez would be if he were removed from this country? And there are country conditions reports that talk about the risks of murder or kidnapping upon return. Yes, but that's just a factual determination that needs to be made by the agency. And here they simply found that there was insufficient evidence to demonstrate that that would be enough of a factor to impact the analysis. Are you getting that finding of insufficient evidence to demonstrate from the declaration at the outset that all evidence was considered, even if not mentioned? Yes, Your Honor. So would that be sufficient in any case for an immigration judge to just put a blanket statement up front that all evidence was considered and we have to accept that? No, I don't believe so necessarily, Your Honor. Here, again, we have a lengthy opinion and we have numerous citations to country conditions reports throughout the opinion. So we have other indications going beyond just that one statement at the outset to show that this immigration judge was doing all she could to consider the evidence. There is hundreds of pages of evidence here, though, and there is no obligation for the court to cite to every piece of that evidence. The court just needs to do the best job they can to consider the relevant evidence and to make their determinations. And those factual determinations are those that are specifically within the ambit of the agency. I understand the argument, the best argument, why he should remain in the United States. Do you have an argument why he should be returned? Well, we're not arguing exactly that he should be returned. We're just arguing that Petitioner has not met his burden of proof to establish enough evidence, to put forth enough evidence to establish that he is entitled to asylum or withholding or Convention Against Torture relief or protection. And turning toward the Convention Against Torture claim, the immigration judge on pages 76 and 77 did a thorough analysis there as well of all of the factors relevant to potential future torture, including whether there was past torture and several other factors, including the ones that we've already discussed regarding the ability of Hernandez to relocate when he arrives, but also including some acknowledgment of other evidence in the record, including the extrajudicial killings done by security forces, but simply finding that there was insufficient evidence that he would come to their attention. What do we do with the fact that the BIA went quite far beyond the factual findings of the immigration judge in making its CAT determinations? The board did not go beyond or significantly beyond what the immigration judge found. So the immigration judge has two paragraphs specifically devoted to this issue on page 77, where she went thoroughly through all of this evidence. So it is evidence that then was rehashed to a degree by the board in its analysis of the CAT claim as well, but here you have significant explanation as to all of those factors, and the board merely acknowledged that the immigration judge had considered all of those factors together in doing its analysis. I have some examples, including on page 6 of the appendix, where the BIA found that the immigration judge didn't err in the decision to credit testimony that threats against him occurred before he left El Salvador, because the threat wasn't mentioned at the hearing before the immigration judge, for instance, and it sort of went beyond what the immigration judge had discussed in her opinion. So let's assume that just for the sake of argument here, that the BIA did make additional factual findings to support its affirmance of the IJ's decision. Would that be, in that case, is that appropriate? No, it is not appropriate for the board to engage in its own fact finding, but here regarding that specific point on page 62, note 6, the immigration judge did specifically acknowledge the point in the record where the, referring essentially to the testimony that Hernandez gave, that he testified that he had not been threatened after he left El Salvador. But they asked where he went. Sorry, what was that? They did ask about his whereabouts. Sorry. I was just referring to footnote 6, but I understand that's your point. Okay. Yeah, so in footnote 6, the immigration judge is referring to the testimony that Hernandez gave where he said when asked whether he had been threatened after he left El Salvador, he said no. And the immigration judge found him to be credible, so it's fully consistent with that. If the court has any further questions, I'd be happy to answer those. If nothing further, counsel, thank you. Thank you, Your Honors. Your Honors, if I could just make three short points. First, on the issue of whether the agency appropriately considered all the evidence, the opinions here of the IJ and the BIA are not sufficient. And importantly, that's legal error that this court can review de novo. This court has been very clear that a boilerplate statement that all the evidence has been considered is not sufficient because the agency needs to provide sufficient analysis for this court to be able to apply its own standard of review appropriately. And nor is, as the court held in both Huang and Nisimba, nor is it sufficient for the agency to cherry pick a few pieces of evidence that it believes supports the denial of the claim. It needs to engage with evidence that goes the other way and explain why it's chosen to credit one side over the other, and that didn't happen here. Particularly on the issue of unwilling or unable, where there's no discussion of country conditions whatsoever in that portion of the IJ's decision, as well as in the political opinion section and the CAG section, where the only source in the political opinion section that cited the IJ's sites for really the opposite conclusion, that that piece of country conditions evidence stands for the article by Professor McNamara. So that's legal error and requires remand. The decision was reviewed by an appellate judge, wasn't it? An appellate immigration judge? Yes, Your Honor. And she agreed with the immigration judge, the initial judge. So he has two decisions concluding that asylum cannot be granted. Right. On this issue, the BIA's decision is just incorrect. On page... I'm actually looking at the appellate immigration judge's decision. I'm sorry, Your Honor. Yes, that appellate immigration judge is part of the Board of Immigration Appeals. But that judge agreed with the initial immigration judge, although the appellate judge sets forth additional standards or additional comments why he should not be granted asylum. Right. So on this issue of the country conditions evidence, I point in particular to pages two to three of the BIA decision, where the BIA says the immigration considered evidence of conditions in El Salvador as it relates to unwilling or unable. She didn't. That's just not in her written opinion. So that's incorrect, and that's where we identify legal error. Also, as Judge Freeman was mentioning earlier, the BIA did, especially in the CAT analysis, supplement the immigration judge's reasoning with its own factual findings. And as counsel conceded, that's inappropriate. And that really goes back to the failure to follow the MIRI prongs. This Court has over and over repeated why those prongs are important. It's not just a formalistic test. The purpose of it is to allow the BIA and this Court to apply the appropriate standard of review. And so by the IJ failing to make the factual findings she was required to make, the BIA then was forced to jump in and misapply its standard of review. Thank you, Your Honor. Thank you, counsel. We appreciate the argument. We thank both counsel for their arguments. We will also take this matter under advisement. And that concludes the Court's sitting for today. Thank you. Thank you.